IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 4, 2022

## IN RE S.S.

**Appeal from the Circuit Court for Bradley County**
No. V-20-069     Lawrence Howard Puckett, Judge
_____

## No. E2021-00761-COA-R3-PT
_____

This appeal involves termination of the parental rights of two parents who severely abused their child. The trial court found by clear and convincing evidence that one ground for termination existed based on a prior adjudication of severe child abuse and that termination was in the best interest of the child. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KRISTI M. DAVIS, JJ., joined.

Wilton A. Marble, Jr., Cleveland, Tennessee, for the appellant, Roberto S.

Emily Brenyas, Chattanooga, Tennessee, for the appellant, Olga S.

Herbert H. Slatery, III, Attorney General and Reporter; and Kathryn A. Baker, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children Services.

## OPINION

The female child at issue in this proceeding, S.S., was born in September 2018.[1] No father was listed on the child's birth certificate. The child's mother, Olga S., was originally from Honduras but was residing in Bradley County, Tennessee, with her half-brother, Roberto S. Both Olga and Roberto speak very little English.

---

[1] We refer to the child by initials in order to protect her privacy. We do note that the child's birth certificate reflects another birth date. However, the mother and foster parent both testified that she was born in September, the court documents reflect September, and there is no mention of the discrepancy on the birth certificate in the record. Thus, we will proceed on the assumption that she was born in September.

On or about January 2, 2019, when S.S. was three months old, Olga and Roberto took her to a pediatrician's office in such a condition that she was immediately transported by ambulance to a children's hospital in Chattanooga, Tennessee. The child had at least a dozen broken bones in various stages of healing, including a right arm fracture and a left leg fracture. S.S. had a hematoma from a previous brain bleed that required monitoring by the neurology department. She had an injury to her right ear and had developed "cauliflower ear," requiring surgery to drain and repair it. She had a hole in her upper palate and a split frenulum between her nose and lip. S.S. was so severely malnourished that her skin could be pulled away from her bones.

Mother was arrested on or around the same date and charged with aggravated child abuse. S.S. was placed in the custody of the Tennessee Department of Children's Services, and Tabitha Crow was assigned as her family service worker. Ms. Crow visited S.S. the same day she was admitted to the hospital and took photographs of her condition. After about a week, S.S. was discharged from the hospital and placed in a foster home. However, she required weekly pediatrician visits and appointments with specialists in gastroenterology, neurology, and orthopedics. Because of the hole in her palate and nerve damage in her mouth, S.S. could not drink liquid and would aspirate her bottle, so her formula had to be thickened to a pudding-like consistency and she was fed upright. The original foster home was unable to maintain the level of care S.S. required, so on March 11, 2019, at the age of five months, she was placed in a foster home through a therapeutic foster care agency with a foster mother who worked in a neonatal intensive care unit.

A permanency plan was developed for Olga, although she remained incarcerated. An individual who was originally named as a putative father of S.S. was excluded by DNA testing. When Olga failed to name any other alternatives, DCS eventually requested a DNA test from Roberto, her half-brother who lived in the home with her and S.S. The test was performed in October 2019 and indicated that Roberto was the father of S.S., who, by that time, had just turned one year old. Roberto was added as a parent on the permanency plan in early 2020 and was approved to begin therapeutic visitation with the child.

On February 7, 2020, DCS filed a petition in circuit court seeking to terminate the parental rights of both Olga and Roberto. The petition alleged one ground for termination of parental rights: severe child abuse pursuant to Tennessee Code Annotated section 36-1-113(g)(4). It also alleged that termination was in the best interest of S.S. Olga remained incarcerated from her arrest on the charge of aggravated child abuse. Roberto had two in-person visits with the child in 2020, but in-person visitation was suspended due to the Covid-19 pandemic, and he was limited to weekly video calls thereafter.

Throughout this period, a separate dependency and neglect proceeding was pending in juvenile court. On November 12, 2020, the juvenile court entered an adjudicatory and dispositional hearing order finding by clear and convincing evidence that S.S. was dependent and neglected because her parents could not provide a safe and suitable home

for her "due to severe physical abuse." Based on the child's medical records and a doctor's deposition testimony, the juvenile court found that S.S. "had fractures throughout her body, as well as other physical injuries." Although both parents asserted their Fifth Amendment rights, Roberto did admit during his testimony that he and Olga "were the only caregivers for the child." The juvenile court specifically found "pursuant to T.C.A. § 37-1-102(b)(27), that the child [S.S.] was severely abused by both parents."

Also while the termination case remained pending, on April 1, 2021, Roberto was arrested and charged with incest. His video visits ceased upon his arrest and incarceration. Roberto "bonded out" but then failed to appear for his court date on the incest charge, resulting in another arrest in mid-May for his failure to appear.

The termination trial was held on June 21, 2021. Both Olga and Roberto remained incarcerated but were present for the hearing with counsel and interpreters. At the outset, both parents' attorneys conceded that the severe child abuse finding by the juvenile court was binding on the circuit court in the termination case. However, both attorneys argued on behalf of their clients that it was not in the best interest of the child to terminate parental rights.

S.S. was two and a half years old at the time of trial, and she had resided in the therapeutic foster home since the age of five months. Olga had been incarcerated continuously since the date of her arrest and had not had any contact with the child during that time. Olga asserted her Fifth Amendment rights in response to many questions. She testified that her trial date on the charge of aggravated child abuse was set for August. She was of the understanding that there was "an immigration hold" on her, and she did not know if she would face deportation proceedings once her other legal proceedings concluded. Olga testified that she had taken every class offered while she was incarcerated and presented many certificates confirming her attendance. She testified that even though she had not seen her child in two years, she still felt connected to her as a mother and believed that it was in the best interest of the child for them to be reunited one day.

Roberto testified that he had an upcoming court date the following month for his pending incest charge. He testified that he was in the process of making an arrangement with the prosecutor to plead guilty for a potential sentence of four years. He testified that there was no "immigration hold" on him but that his immigration status was "illegal." Roberto testified that he initially requested custody of S.S. only as her uncle because he did not believe he was the father, but he admitted to having a sexual relationship with Olga. He denied having anything to do with the injuries to S.S. and claimed that they occurred while she was in Olga's care, yet he admitted that the juvenile court had found that he committed severe abuse as well.

Ms. Crow testified as the family service worker assigned to the case for the past two years. She testified that S.S. gained significant weight after she was removed from her

- 3 -

parents and that doctors did not discover anything that would have prevented her from gaining weight. She testified that S.S. had participated in speech therapy, feeding therapy, and physical therapy with Tennessee Early Intervention Services. Ms. Crow said that S.S. may have to undergo orthopedic surgery in the future depending on her growth because of previous fractures that "had already set themselves." S.S. was also awaiting evaluation by a plastic surgeon within the next year or two to address her split frenulum, which sometimes made it hard to breathe. It was possible that the surgeon would add cartilage to "bring her nose out a little bit."

Ms. Crow had observed S.S. with Roberto during the in-person therapeutic visitation in 2020 and testified that she appeared hesitant to engage with him. Ms. Crow entered the room to sit with S.S. in an attempt to calm her down when she started showing signs of anxiety. She said S.S. did not really want to go to Roberto or be near him. Ms. Crow said Roberto participated in video visits thereafter, but they ended when he was incarcerated on the incest charge. She admitted that it was difficult to establish any bond over a video call because the child showed no interest in the phone and just wanted to play. She said Roberto was ordered to pay child support and did so for a few months before he was incarcerated.

Ms. Crow testified that S.S.'s current foster family was "the only family she knows," as she had lived in the home since she was five months old. She believed that a change of caretakers would be detrimental to the child and cause her to lose her sense of belonging and stability. She testified that S.S. was integrated not only with the foster parents but with another child in the home and with the parents of the foster parents.

S.S.'s foster father also testified. He described the child's condition when she came to their home at the age of five months. At that time, she had scars on her face and ear from trauma and could not hold up her head or drink liquids. He described the various specialist appointments she had and the therapies that she had received, including therapeutic sessions for trauma. The foster father testified that the damage to the nerves in the child's jaw or mouth had resulted in her not having front teeth and that they were not expected to ever develop, so she would eventually need partials or implants or something similar. Overall, he said that "the physical scars are still with her" but she is thriving and in excellent health. He said she referred to the foster parents as "Momma" and "Dadda," called their son her brother, and considered their parents as her grandparents. The foster father said they were absolutely interested in adopting S.S. if she became available.

The foster father acknowledged that S.S. did not interact much with Roberto during the video visits and said that it was difficult for all of them because the foster family and the child speak English, and Roberto spoke a mixture of Spanish and English. He said S.S. did not refer to her biological parents by any name or ask about Roberto after visits.

On June 23, 2021, the circuit court entered an order terminating the parental rights

of both parents. The court found by clear and convincing evidence that the ground of severe child abuse had been proven and that it was in the best interest of the child to terminate parental rights. Olga and Roberto separately filed notices of appeal to this Court.

## II. ISSUES PRESENTED

The only issue raised by Olga on appeal is whether the trial court erred in its best interest analysis by "placing excessive weight on a nonstatutory factor and giving little weight" to other factors. Roberto raises two issues – asserting that (1) the trial court erred in finding the ground of severe child abuse but "not specifying which of the definitions it was relying on," and (2) "relying on an improper factor" in its best interest analysis.

Regardless of whether the parties have raised the issues, we must review the trial court's decision as to the sole ground for termination and the best interest analysis. *See In re Carrington H.*, 483 S.W.3d 507, 511 (Tenn. 2016) (holding that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal").

## III. STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Pursuant to the statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, that party must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* The grounds are "cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground." Tenn. Code Ann. § 36-1-113(g). Second, the petitioner must prove that termination of parental rights is in the best interest of the child, considering the best interest factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Kaliyah S.*, 455 S.W.3d at 552.

Because of the constitutional dimension of the parent's rights at stake, the party seeking termination "must prove all the elements of their case by clear and convincing evidence." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). To be clear and convincing, the evidence must enable the finder of fact "to form a firm belief or conviction regarding the truth of the facts" sought to be established and eliminate "any serious or substantial doubt about the correctness" of the findings. *Id.* Due to this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). Appellate courts review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each factual finding to be correct unless the

evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. *Grounds for Termination*

Tennessee Code Annotated section 36-1-113(g)(4) provides that one ground for termination of parental rights exists if:

> The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court *or* is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

(emphasis added). Section 37-1-102(b)(27) defines "severe child abuse" as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;
> (ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(c);
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts has caused or will reasonably be expected to produce severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or intellectual disability, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct;
>
> (C) The commission of any act towards the child prohibited by § 39-13-309, §§ 39-13-502 -- 39-13-504, § 39-13-515, § 39-13-522, § 39-13-527, § 39-13-531, § 39-13-532, § 39-15-302, § 39-15-402, or § 39-17-1005 or the knowing failure to protect the child from the commission of any such act towards the child;

(D) Knowingly allowing a child to be present within a structure where the act of creating methamphetamine, as that substance is identified in § 39-17-408(d)(2), is occurring;

(E) Knowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child; or

(F) Knowingly allowing a child to be within a structure where any of the following controlled substances are present and accessible to the child:
(i) Any Schedule I controlled substance listed in § 39-17-406;
(ii) Cocaine;
(iii) Methamphetamine; or
(iv) Fentanyl[.]

Tenn. Code Ann. § 37-1-102(b)(27).[2]

Notably, this ground for termination provides two different "avenues for a finding of severe child abuse." *In re Anna B.*, No. M2016-00694-COA-R3-PT, 2017 WL 436510, at *4 (Tenn. Ct. App. Feb. 1, 2017). The finding may have already been made in a "prior order of a court," or, in the alternative, the finding may be made "by the court hearing the petition to terminate parental rights or the petition for adoption." *See* Tenn. Code Ann. § 36-1-113(g)(4); *In re Anna B.*, 2017 WL 436510, at *4. Thus, "'[a]s the statute makes clear, the finding of severe abuse can be based on a prior court order or on evidence of 'severe child abuse' submitted to the court hearing the termination case.'" *In re Brianna T.*, No. E2017-01130-COA-R3-PT, 2017 WL 6550852, at *4 (Tenn. Ct. App. Dec. 22, 2017).

Here, the circuit court's termination order states that "[t]he child was adjudicated dependent and neglected and severely abused" and "[t]he adjudicatory order issued by the Bradley County Juvenile Court was not appealed." It further states, "The Court applies the Doctrine of Res Judicata as this matter was fully litigated in the dependency and neglect proceeding . . . . The Department submitted a certified copy of the adjudicatory order which was a final order that was not appealed by the Respondents." The order further stated, perhaps alternatively, that both Olga and Roberto "committed severe child abuse against the child [S.S.] by physically abusing the child leading to numerous fractures, a torn frenulum and an ear injury, as well as due to extreme nutritional neglect; or by failing to protect the child from the abuse and extreme neglect," as they could provide "no explanation for the nature and extent of the child's injuries."

---

[2] Subsection (f) was added in 2021. *See* 2021 Pub.Acts, c. 508, § 1.

In a termination of parental rights proceeding, the doctrine of res judicata prevents a parent from re-litigating whether he or she committed severe child abuse when such a finding has been made in a previous dependency and neglect action. *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016) (citing *In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012)). "A finding of severe abuse in dependency and neglect proceedings has serious ramifications . . . since a finding of severe abuse can serve as a ground for termination of parental rights." *In re Kaliyah S.*, 455 S.W.3d at 537 n.5 (citing *In re Samaria S.*, 347 S.W.3d 188, 201 (Tenn. Ct. App. 2011)).

> The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. . . . The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing.

*In re Samaria S.*, 347 S.W.3d at 201 (quoting *DCS v. M.S.*, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005)). Upon a finding of severe abuse, "one ground for termination of the parent's parental rights is effectively established." *Id.*

At the beginning of the termination trial, the attorneys for Olga and Roberto conceded that the severe abuse finding from juvenile court was binding on the circuit court in this case. However, on appeal, Roberto argues that there was a fatal error in the *circuit court's termination order* with respect to the ground of severe child abuse because the circuit court did not "specify[] which of the definitions it was relying on." Roberto relies on this Court's decisions in *In re L.F.*, No. M2020-01663-COA-R3-PT, 2021 WL 3782130 (Tenn. Ct. App. Aug. 26, 2021), and *In re S.S.-G.*, No. M2015-00055-COA-R3-PT, 2015 WL 7259499 (Tenn. Ct. App. Nov. 16, 2015).

In *In re S.S.-G.*, this Court was reviewing on appeal a trial court's "independent, *de novo*, finding of severe child abuse," but the trial court's order stated only that the appellant had "sexually abused the child . . . pursuant to T.C.A. § 37-1-602 and that this sexual abuse constitutes severe abuse" pursuant to section 37-1-102(b). 2015 WL 7259499, at *9-10. Because the code sections the trial court cited contained "many definitions" of "child sexual abuse"[3] and alternative definitions of "severe child abuse," and the trial court failed

---

[3] To illustrate, we quoted the many possible definitions of "child sexual abuse" found in Tennessee Code Annotated section 37-1-602(a)(3)(A)-(D), as follows:

> (3)(A) "Child sexual abuse" means the commission of any act involving the unlawful sexual abuse, molestation, fondling or carnal knowledge of a child under thirteen (13) years of age that prior to November 1, 1989, constituted the criminal offense of:
> (i) Aggravated rape under § 39-2-603;
> (ii) Aggravated sexual battery under § 39-2-606;

(iii) Assault with intent to commit rape or attempt to commit rape or sexual battery under § 39-2-608;
(iv) Begetting child on wife's sister under § 39-4-307;
(v) Crimes against nature under § 39-2-612;
(vi) Incest under § 39-4-306;
(vii) Promotion of performance including sexual conduct by minor under § 39[-]6-1138.
(viii) Rape under § 39-2-604;
(ix) Sexual battery under § 39-2-607; or
(x) Use of minor for obscene purposes under § 39-6-1137;
(B) "Child sexual abuse" also means the commission of any act involving the unlawful sexual abuse, molestation, fondling or carnal knowledge of a child under thirteen (13) years of age that on or after November 1, 1989, constituted the criminal offense of:
(i) Aggravated rape under § 39-13-502;
(ii) Aggravated sexual battery under § 39-13-504;
(iii) Aggravated sexual exploitation of a minor under § 39-17-1004;
(iv) Criminal attempt as provided in § 39-12-101 for any of the offenses in (a)(3)(B)(i)—(iii);
(v) Especially aggravated sexual exploitation of a minor under § 39-17[-]1005;
(vi) Incest under § 39-15-302;
(vii) Rape under § 39-13-503;
(viii) Sexual battery under § 39-13-505; or
(x) Sexual exploitation of a minor under § 39-17-1003;
(C) "Child sexual abuse" also means one (1) or more of the following acts:
(i) Any penetration, however slight, of the vagina or anal opening of one (1) person by the penis of another person, whether or not there is the emission of semen;
(iii) Any contact between the genitals or anal opening of one (1) person and the mouth or tongue of another person;
(iii) Any intrusion by one (1) person into the genitals or anal opening of another person, including the use of any object for this purpose, except that it shall not include acts intended for a valid medical purpose;
(iv) The intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of either the child or the perpetrator, except that it shall not include:
(a) Acts that may reasonably be construed to be normal caretaker responsibilities, interactions with, or affection for a child; or
(b) Acts intended for a valid medical purpose;
(v) The intentional exposure of the perpetrator's genitals in the presence of a child, or any other sexual act intentionally perpetrated in the presence of a child, if such exposure or sexual act is for the purpose of sexual arousal or gratification, aggression, degradation, or other similar purpose;
(vi) The sexual exploitation of a child, which includes allowing, encouraging, or forcing a child to:
(a) Solicit for or engage in prostitution; or
(b) Engage in an act prohibited by § 39-17-1003; and
(D) For the purposes of the reporting, investigation, and treatment provisions of §§ 37-1-603—37-1-615 "child sexual abuse" also means the commission of any act specified in subdivisions (a)(3)(A)-(C) against a child thirteen (13) years of age through seventeen (17) years of age if such act is committed against the child by a parent, guardian, relative, person residing in the child's home, or other person responsible for the care and custody of the

to specify the exact definition(s) on which it relied, this Court was unable to conduct a "meaningful appellate review" of the trial court's decision on appeal. *Id.* at *12. As a result, we vacated the trial court's decision and remanded with instructions for the trial court to make specific findings to include "the specific statutory sections and/or definition on which the court relies." *Id.* at *13. We stated, "Where the statute provides several possible definitions for a ground, the trial court must specify the exact definition that it relies upon in reaching its ultimate conclusion. In the absence of such specificity, this Court cannot conduct a meaningful appellate review." *Id.* at *12.

This Court followed the reasoning of *In re S.S.-G.* in *In re L.F.*, 2021 WL 3782130, at *12-13. We explained that there were several alternative definitions of "severe child abuse" in Tennessee Code Annotated section 37-1-102(b)(27). *Id.* at *12. We were tasked with reviewing a trial court's independent conclusion that the parent committed severe child abuse under ground (g)(4), but the court had not specified which of those definitions it found applicable. *Id.* It only generally stated that one parent "sexually abused" the child and that the other parent "failed to protect" the child. *Id.* Thus, it was not clear whether the trial court had relied on one of the "many" sexual offenses referenced in definition (C) or some other definition. *Id.* Under the circumstances, we found it appropriate to reverse the ground of "severe child abuse" due to the lack of specific findings but did not remand for further proceedings because four other grounds for termination had been upheld on appeal. *Id.* at *13.

More recently, however, in *In re Kailey A.*, No. E2021-00801-COA-R3-PT, 2022 WL 773617, at *9 (Tenn. Ct. App. Mar. 14, 2022), this Court noted that a trial court's order regarding the ground of severe child abuse "did not specify which subsection it was applying when determining that Mother committed severe child abuse," but, "based on the evidence," we concluded that "subsection (C) is applicable" and proceeded to consider that definition. We ultimately affirmed the juvenile court's finding of severe abuse under that definition. *Id.* Likewise, for two other children in the case, we noted, "The Juvenile Court also did not specify a subsection under which it found Mother had severely abused [the youngest children]. However, subsections (A) and (E) are relevant to these allegations and the evidence." *Id.* at *10. We ultimately concluded that "[a]lthough the Juvenile Court did not specify the specific definition to which it had relied, severe child abuse against [these children] was proven as to both subsections (A) and (E)." *Id.* Thus, a trial court's failure to specify a particular subsection has not always required reversal. *See also In re Angelleigh R.*, No. M2020-00504-COA-R3-JV, 2021 WL 1994033, at *8 (Tenn. Ct. App. May 19, 2021) (acknowledging the approach in *In re S.S.-G.* in termination cases but explaining that "[w]e have not taken the same position, however, in cases involving only dependency and neglect," and the court would look at the facts and determine which

---

child[.]

*Id.* at *10-11.

subsection was implicated rather than remanding for specific findings); *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *9-10 (Tenn. Ct. App. May 15, 2009) (concluding that the trial court's failure to specify statutory ground (g)(4) was "not fatal in and of itself if the remainder of the order [was] sufficiently specific" and allowed this Court to "glean" that the ground of severe child abuse was the one on which the trial court relied).

On appeal, Roberto argues that the circuit court's termination order is deficient because it did not specify which of the statutory subsections was met under the various definitions of "severe child abuse." Thus, he suggests that it is appropriate to remand this matter to the trial court. We disagree. Here, we are not required to review on appeal an independent finding of severe child abuse made in the first instance by the circuit court. Instead, the circuit court specifically stated that it "applies the Doctrine of Res Judicata as this matter was fully litigated in the dependency and neglect proceeding," and DCS had submitted a certified copy of the adjudicatory order finding severe child abuse, which the parents did not appeal. Again, Tennessee Code Annotated section 36-1-113(g)(4) provides that one ground for termination has been established if "[t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court[.]" The juvenile court's adjudicatory order contained a finding of severe child abuse pursuant to "section 37-1-102(b)(27)." Because we are not tasked with reviewing the correctness of that decision, the concerns present in *In re S.S.-G* and *In re L.F.* regarding meaningful appellate review simply are not present here.

When reviewing an independent finding of severe child abuse under ground (g)(4) on appeal, the following standard of review applies:

> In determining whether severe child abuse is established by clear and convincing evidence, we must "'distinguish between the specific facts found by the trial court and the combined weight of those facts.'" [*In re S.J.*, 387 S.W.3d 576, 591 (Tenn. Ct. App. 2012)] (quoting *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007)). The specific underlying facts, including whether the parent's conduct with respect to the child's injuries was "knowing," "need only be established by a preponderance of the evidence." *Id.* at 592. Once the facts have been proven, the court must examine "the combined weight of all of those facts, to see if they clearly and convincingly show severe child abuse." *Id.*

*In re Walter B.*, No. M2020-00069-COA-R3-PT, 2020 WL 7422070, at *4 (Tenn. Ct. App. Dec. 18, 2020) *perm. app. denied* (Tenn. Mar. 9, 2021). However, when proceeding under the alternative second avenue under ground (g)(4), "the ground is proven by the prior order finding severe child abuse," and "[t]he issue of whether abuse occurred may not be re-litigated at the termination hearing." *In re B.R.W.*, No. M2008-00468-COA-R3-PT, 2008 WL 2811301, at *2 (Tenn. Ct. App. July 21, 2008); *see, e.g.*, *In re Sebashtian K.*, No. E2020-01439-COA-R3-PT, 2021 WL 5071966, at *6 (Tenn. Ct. App. Nov. 2, 2021) ("The

- 11 -

court's previous severe abuse finding serves as conclusive proof that Mother and Father committed severe child abuse[.]"); *In re Madylynn C.*, No. M2021-00184-COA-R3-PT, 2021 WL 4476810, at *10 (Tenn. Ct. App. Sept. 30, 2021) *perm. app. denied* (Tenn. Dec. 28, 2021) ("Because neither Appellant challenged the finality or the validity of the adjudicatory dependency and neglect order, the issue of severe child abuse is res judicata."); *In re S.M.C.*, No. 01A01-9807-JV-00358, 1999 WL 378742, at *2-3 (Tenn. Ct. App. June 11, 1999) ("The existence of the prior court order finding the [parents] committed severe child abuse suffices to establish grounds for termination of parental rights under Tenn. Code Ann. § 36-1-113(g)(4)."). "The doctrine of res judicata is 'based on the public policy favoring finality in litigation and does not depend upon correctness or fairness, as long as the underlying judgment is valid.'" *In re S.S.-G.*, 2015 WL 7259499, at *7 (quoting *Lee v. Hall*, 790 S.W.2d 293, 294 (Tenn. Ct. App. 1990)).

Because the final order of the juvenile court found that both parents committed severe child abuse under Tennessee Code Annotated section 37-1-102(b)(27), this ground for termination of their parental rights "is effectively established." *In re Samaria S.*, 347 S.W.3d at 201. The termination order was not deficient.

### B. Best Interest

If at least one ground for termination has been proven by sufficient evidence, "the court next determines whether the proof amounts to clear and convincing evidence that terminating parental rights is [in] the best interests of the child." *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (citing *In re Carrington H.*, 483 S.W.3d at 523). When the petition was filed in this case, Tennessee Code Annotated section 36-1-113(i) listed nine statutory factors for consideration.[4] Determining what is in the best interest of a child "involves more than simply 'tallying the number of statutory factors weighing in favor of or against termination.'" *In re Neveah M.*, 614 S.W.3d 659, 679 (Tenn. 2020) (quoting *In re Gabriella D.*, 531 S.W.3d at 682). The analysis is factually intensive, and "[t]he unique facts and circumstances of each case dictate the weight and relevance that a court should afford each statutory factor." *Id.* "A court must consider all the statutory factors but may appropriately ascribe more weight—even outcome determinative weight—to one statutory factor or rely upon fewer than all of the statutory factors." *Id.* We must bear in mind that the child's best interest is viewed from the child's perspective rather than the parent's perspective. *In re Gabriella D.*, 531 S.W.3d at 681. "'[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.'" *Id.* at 681-82 (quoting Tenn. Code Ann. §

---

[4] "The Tennessee General Assembly recently amended the statutory best interest factors provided in Tennessee Code Annotated section 36-1-113(i)." *In re Porcalyn N.*, No. E2020-01501-COA-R3-PT, 2021 WL 2026700, at *12 n.6 (Tenn. Ct. App. May 21, 2021) (citing 2021 Tenn. Pub. Acts, ch. 190 § 1). However, "[t]his amendment does not affect the instant case because we apply the version of the statute in effect at the time the petition for termination was filed." *Id.* (citing *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App.2017)).

36-1-101(d)).

Before we address the statutory factors, we note the issues that both parents raise on appeal with respect to the best interest analysis. Roberto argues that the trial court should not have considered the incestuous relationship between him and Olga and that this was "an improper factor" for the court to consider. Olga argues that the trial court placed "excessive weight on a nonstatutory factor" – the issue of incest. Thus, we emphasize at the outset of our analysis that we discern no error in the trial court's consideration of the issue of incest within its best interest analysis. The statutory best interest factors "are non-exclusive, and courts may also consider any other proof offered at a termination proceeding that is relevant to the best-interests analysis." *In re Neveah M.*, 614 S.W.3d at 679.

Roberto attempts to downplay the seriousness of the incestuous relationship and its relation to the best interest of S.S., arguing on appeal that a charge of incest is a mere "status crime involving two consenting adults that occurred before the child was even conceived." He argues that the crime of incest "played virtually no part in this case" and "should not have been considered" as a factor in the best interest analysis. Olga characterizes the incestuous relationship as "an arbitrary fact in evidence" and argues that "it is improper to consider the genetic status of the child as a factor." This Court rejected a similar argument regarding incest in *In re K.B.*, No. M2011-01396-COA-R3-PT, 2012 WL 3104886, at *5 (Tenn. Ct. App. July 31, 2012), where a trial court relied heavily on the fact that the mother had been convicted of the crime of incest and the minor child was the product of that incestuous relationship. *Id.* We said,

> After thoroughly reviewing the record, we find no error in the trial court's conclusion that termination of Mother's parental rights was in the best interests of the child. While we are mindful of Mother's efforts to turn her life around, at this point in the proceedings, our focus is on K.B.'s best interests, not Mother's. It is undisputed that Mother was convicted of incest for the numerous sexual encounters she had with . . . her minor stepson. In fact, in her brief to this Court, Mother attempts to minimize the severity of the incestuous relationship, stating that [the child's father] was only her "step-son, not a blood relative" and that it was only "termed 'abuse' because at the time [he] was a minor, just shy of 18, but by his own testimony he was never 'forced' into anything." While Mother's statements illustrate her inability to grasp the severity of her incestuous behavior, the rest of the family, most importantly K.B., continues to suffer the repercussions of those actions.

*Id.* Roberto's and Olga's arguments on appeal are likewise wholly unconvincing.

We proceed to review the best interest factors discussed by the trial court in its final order. The trial court stated that it had considered all the factors but that it assigned the

- 13 -

most weight and relevance to these:

27) The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that the Respondents, Olga [] and Roberto [], have failed to make a lasting adjustment of their circumstances to make it safe and in the child's best interest to be placed in their care. Specifically, the Respondents severely abused the child or failed to protect the child from such abuse. The child was born from an incestuous relationship between the Respondents. [Olga] has been incarcerated since the child was three (3) months old and remains incarcerated with pending Aggravated Child Abuse charges. [Roberto] is incarcerated and charged with Incest. He is facing an undetermined jail sentence.

28) . . . Respondents, Olga [] and Roberto [], have failed to make a lasting adjustment of their circumstances after the state has made reasonable efforts to help them for such duration of time that lasting adjustment does not reasonably appear possible. Specifically, the Court finds that there is absolutely no indication that the Respondents are remorseful about the injuries suffered by the child. The Respondents know what happened to the child. One or both of them perpetrated the abuse and/or failed to protect the child resulting in severe injury. Further, the Court notes the hostility from [Roberto] toward the physicians who cared for the child and the Department.

29) . . . [T]here is no meaningful relationship between the Respondents, Olga [] and Roberto [], and the child because there has been no contact and no visitation between [Olga] [sic] since the child was three (3) months old. [Roberto] has received therapeutic visitation; however, has not progressed beyond that and has been incarcerated since April 2021 without visitation.

30) . . . Respondent[s], Olga [] and Roberto [], have abused or neglected the child. The Juvenile Court found that the child was dependent and neglected and severely abused in its adjudicatory order. That order was not appealed. The Respondents caused the injuries to the child or failed to protect the child. In addition, the incestuous relationship between the Respondents is problematic to the Court. The Court finds that the family is society's most important unit and the incestuous actions of the Respondents destabilized their relationship with the child. The child should not be confronted with this family's situation and fostering a relationship between the child and the Respondents would cause the child further harm. While all of the factors were considered by the Court, this factor weighs very strongly in favor of termination.

31) . . . [T]here is crime in the Respondents' home. [Olga] is currently incarcerated and has been incarcerated since January 2019 due to the abuse inflicted upon the child. She is charged with Aggravated Child Abuse. Respondent Roberto [] is currently incarcerated and charged with Incest. At the visitation received by [Roberto], the child did not engage with him.

The trial court noted that it had considered other factors and found them favorable to the respondents, including the facts that Roberto had paid some child support and participated in visitation. It gave no weight to the factor regarding the parties' mental state due to a lack of evidence on that issue. Overall, however, the trial court found by clear and convincing evidence that it was in the best interest of the child for the parental rights of both parents to be terminated.

Having carefully reviewed the entire record, we conclude that the proof does not preponderate against the trial court's factual findings, and we conclude that the facts, viewed as a whole, amount to clear and convincing evidence that termination of parental rights is in the best interest of S.S. *See In re Neveah M.*, 614 S.W.3d at 680. It was appropriate for the trial court to give significant weight to the best interest factors regarding the horrific abuse the child endured in the care of her parents, their incarceration, their incestuous relationship, and the lack of any existing relationship between them and the child. Considering the best interest of S.S., from her perspective, it is clear that termination of parental rights is in her best interest.

## IV. CONCLUSION

For the aforementioned reasons, the decision of the circuit court is hereby affirmed and remanded. Costs of this appeal are taxed to the appellants, Olga S. and Roberto S., for which execution may issue if necessary.

_____
CARMA DENNIS McGEE, JUDGE